## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VOHNIE K. LEMON,          )
                                )

          Plaintiff,     )
                                )

          v.               )
                                )     CIVIL CASE NO. 3:08-cv-127

SOMERSET COMMUNITY     )
HOSPITAL, INC.,           )
                                )

          Defendant.    )

## MEMORANDUM OPINION

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on Defendant Somerset Community Hospital, Inc.'s Motion for Summary Judgment (Doc. No. 46), seeking judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56 with respect to all claims asserted in Plaintiff Vohnie K. Lemon's Complaint of May 30, 2008. (Doc. No. 1). Defendant has also filed a Brief in Support of its Motion (Doc. No. 47). Plaintiff asserts claims under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA"), alleging unlawful retaliation in response to reports of sexual harassment in the workplace. Plaintiff has filed a Response and Brief in Opposition to the Motion for Summary Judgment (Docs. No. 49-50). For the reasons that follow, Defendant's Motion is **DENIED**.

## II. BACKGROUND

Plaintiff had been employed by Somerset Hospital, in Somerset, Pennsylvania for over fifteen years, beginning August 1, 1991, and ending January 29, 2007. Doc No. 46 at 2; Doc No. 46-1 at 21; Doc No. 50 at 2-3. Plaintiff was an at-will employee at Somerset Hospital and did not have a written employment contract. Doc No. 46-1 at 4. During her tenure at the hospital, Plaintiff received regular pay increases, and at the time her employment ended, she had been promoted to the position of Billing Supervisor / Coordinator of Patient Business Services. Doc. No. 46-2 at 6, 65. Her immediate supervisor was Joyce Farrell, the Director of Patient Business Services. Doc. No. 46-2 at 5, 65, 72. Joyce Farrell's immediate supervisor was Somerset Hospital's CFO, Ron Park. Doc. No. 46-2 at 10, 65. Also under Park was Bob McNelly, the Information Services Director. Doc. No. 46-1 at 4. Joyce Farrell's husband Mike Farrell was the CEO of Somerset Hospital. Doc. No. 46-1 at 72-77; Doc. No. 46-2 at 72. The hospital's Human Resources Director was Sharon Glover. Doc. No. 46-4 at 128, 138. Somerset Hospital has both a sexual harassment policy and a corrective action policy for discipline of employees. Doc. No. 46-4 at 111-19.

In August 2005, Somerset Hospital began a series of technology updates, including the conversion of a billing program to a newer version with the help of a company named McKesson. Doc. No. 46-1 at 17-21. Plaintiff had been designated to act as a "superuser" during the conversion process. Doc. No. 46-1 at 17. Three other employees in her department had also been assigned superuser status: Jennifer Miller, Mary Martha Pritts, and Christina Lee Hillegas. Doc. No. 46-1 at 17. Pritts was eventually removed as a superuser, and Miller was terminated from employment by the hospital. Doc. No. 46-1 at 18. Plaintiff's duties as superuser included handling insurance bills and claims billing, and training her subordinates in the billing

2

department. Doc. No. 46-1 at 18. Documentary evidence provided by the parties recorded the following sequence of events and interactions between Plaintiff and her co-workers after the initiation of the computer conversion process at Somerset Hospital.

On October 13, 2005, Plaintiff's fellow superuser and subordinate, Hillegas, reported to Plaintiff that McNelly had made unwanted and aggressive sexual advances while in the workplace. Doc. No. 46-2 at 65-71. Plaintiff and Joyce Farrell forwarded a report of Hillegas' statements to Ron Park on October 17. Sharon Glover and Park conducted an investigation, interviewing all parties involved. Hillegas alleged that McNelly had exposed himself to her on several occasions, forced her to kiss him, and engaged in other sexually suggestive conduct while in the workplace. *Id.* at 65-6. Hillegas indicated that she never reported McNelly's behavior because of his supervisory position. *Id.* at 66-7. She also named a number of other female personnel at the hospital whom McNelly allegedly treated similarly. *Id.* at 67. However, Hillegas supposedly never felt threatened and did not wish for the hospital to take any action. *Id.* Following the investigation, Glover requested that Hillegas not contact McNelly, and that Plaintiff or Joyce Farrell handle any matters that might otherwise involve contact with McNelly. *Id.* McNelly denied many of Hillegas' allegations, but was likewise instructed to have no further contact with her. *Id.* at 69-70.

On November 11, 2005, Park wrote an email to Plaintiff, copying the message to Joyce Farrell, Glover, and Mike Farrell. Doc. No. 46-1 at 92. In it, he indicated that an investigation had been made regarding her report of potentially inappropriate sexual conduct on the part of McNelly toward Hillegas. *Id.* Park indicated that a course of corrective action had been taken and that Plaintiff "absolutely did the right thing" in bringing the matter to his attention. *Id.* The email was in response to Plaintiff's uncertainty over whether she took the proper action. *Id.*

In a March 31, 2006 note, Plaintiff's fellow superuser and subordinate, Jennifer Miller, made a number of negative allegations regarding Plaintiff's work performance. Doc. No. 46-1 at 91; Doc. No. 46-4 at 40. Miller alleged that Plaintiff was incompetent and had engaged in inappropriate sexual conversations, including sexual comments regarding staff members at Somerset Hospital. *Id.* Miller later sent an email to Glover on April 24, 2006, again complaining about Plaintiff's behavior in the workplace. Doc. No. 46-1 at 87. Plaintiff allegedly engaged in inappropriate conversations of an intimately personal and lewd sexual nature on multiple occasions with co-workers. *Id.* Plaintiff also allegedly asked her subordinate, Hillegas, to pluck a chin hair that Plaintiff could not reach. *Id.* When Hillegas refused, Plaintiff allegedly retaliated with harassing phone calls. *Id.* On May 10, 2006, Joyce Farrell sent an email to Park and Glover explaining that she had terminated Miller due to inappropriate workplace conduct, poor performance, and difficulty interacting with co-workers – particularly Plaintiff. Doc. No. 46-1 at 86.

A memorandum from a McKesson representative dated June 29, 2006 indicated that a recent training session with Plaintiff went well. *Id.* The representative reported that Plaintiff "seems to really catch on to the system, and I feel will be a good user." *Id.* Additionally, because Plaintiff wished to maintain her own billing forms following the conversion, the representative stated that she would need to take an additional class in Charlotte, North Carolina for training. Doc. No. 46-2 at 100. Two days after the McKesson memo, Plaintiff received an annual performance appraisal from Joyce Farrell for her work between July 1, 2005 and June 30, 2006. Doc. No. 46-1 at 79-84. Out of eight performance categories, Plaintiff was given six

"Commendable" scores.[1]  *Id.*  Plaintiff received "Acceptable" scores in the remaining categories.[2] *Id.* Joyce Farrell's comments following each rating included the following:

> Vohnie encouraged staff when going through the computer conversion…
> ***
> Set up a training schedule for staff during the computer conversion so they felt comfortable with the new system.
> ***
> Vohnie needs to work with staff on a more professional basis.  Should not get involved in personal issues.  Listen when staff talk [sic] by not interrupting.  Goes to bat for our employees, sometimes even financially.  Helps with projects, assists with cash posting duties.
> ***
> Need to keep the big picture in mind.
> ***
> Worked with McKesson on payor issue to ensure claims were getting submitted.  A lot of issues came up after conversion – Vohnie worked very hard on getting resolved.
> ***
> Strives to keep on budget – maximize cash flow.
> ***
> When explaining information to others, Vohnie talks fast – it becomes confusing to staff…
> ***
> Vohnie assists the staff with customer issues.
> ***
> It has been a difficult year with the computer conversion and staff issues.  I would like Vohnie to use as a learning tool to improve her abilities as coordinator and be the best I know she can be.

Doc. No. 46-1 at 79-84.  Plaintiff, Joyce Farrell, and Glover all signed the appraisal.[3] *Id.* at 84.

---

[1] The rating system for the performance appraisal was a numerical scale ranging from 0 to 4, with 0 defined as "Unacceptable," 1 defined as "Minimally Acceptable," 2 defined as "Acceptable," 3 defined as "Commendable," as 4 defined as "Excellent." Doc. No. 46-1 at 79. "Commendable" is described as: "Performance which consistently exceeds commendable levels. Consistently dependable in accomplishing job assignments and frequently complete [sic] assigned work ahead of schedule.  All assignments are handled in a clearly superior manner." *Id.*

[2] "Acceptable" performance is described as: "Performance which clearly meets and occasionally exceeds standards and should be expected from trained, experienced employees." Doc. No. 46-1 at 79.

[3] Plaintiff's employment file at Somerset Hospital documents a consistent history of raises and positive performance appraisals by Joyce Farrell and Park going back to her start date. Doc. No. 55. She was regularly given ratings indicating that her performance was at least "acceptable," but was more often than not "commendable" or "excellent." *Id.*

On August 2, 2006, Joyce Farrell wrote a letter to Park about the future possibility of eliminating Plaintiff's position. Doc. No. 46-2 at 76-77. In the letter, Farrell indicated that Plaintiff was vital with respect to numerous conversion process issues in the billing department. *Id.* at 76. Farrell acknowledged that there had been some "issues" with Plaintiff, and that Farrell and Plaintiff were working on those problems. *Id.* at 77. However, Farrell believed that eliminating the one employee who took care of all aspects of the computer conversion, knew all payor billings, and covers for other employees, would be detrimental. *Id.* at 77.

Prior to leaving for a training event in Charlotte, Plaintiff sent an email to Park, McNelly, and Joyce Farrell on January 18, 2007. Doc. No. 46-1 at 89. In the letter, Plaintiff attempted to dispel rumors that had been circulating about her willingness to attend the training. *Id.* She explained that she had at one point suggested having on-site training instead, because the trip to Charlotte would cost more money and would take her away from her regular duties for too long. *Id.* She had been made aware that her supervisors were arranging for on-site training in response. *Id.* Just prior to the training in question, however, Plaintiff attended another combined, electronically-led training session at the hospital. *Id.* That training session was also attended by non-hospital personnel for similar computer conversions at other facilities. *Id.* Nancy Ford, a McKesson representative, provided the training remotely from Charlotte. *Id.* Plaintiff did not want the non-hospital personnel present to believe that Somerset Hospital was receiving special treatment by having on-site training sessions instead of requiring Plaintiff to travel to Charlotte for same. *Id.* In response to questioning by the trainer, Plaintiff stated that she would be at the Charlotte training sessions. *Id.* Plaintiff believed that Somerset Hospital staff who overheard this statement, knowing that Plaintiff had asked for on-site training and that such training was being arranged, may have interpreted Plaintiff's statement as an indication that she was being

6

difficult about the training. *Id.* Plaintiff asserted that this was not the case. *Id.* Plaintiff attended training in Charlotte, and upon completion of the course (as an "Advanced Super User"), was awarded a Certificate of Excellence by McKesson. Doc. No. 51 at 3. The certificate, dated January 26, 2007, was signed by Plaintiff's instructors, Ford and Katie Rowan. *Id.*

Just prior to Plaintiff's departure from the hospital, Michelle Russic, the director of Somerset Hospital's pharmacy, apparently made statements to Plaintiff to the effect that McNelly was again directing inappropriate conduct towards another hospital employee – one of Russic's subordinates. Doc. No. 46-4 at 132. Russic characterized the conversation as casual. *Id.* The subordinate in question, Megan Knopsnyder, did not appreciate McNelly's attention, but Russic contended that he did nothing more than bring her donuts on occasion. *Id.* Sometimes McNelly would wait for Knopsnyder at her car and/or give her candy. *Id.* However, all reports of McNelly's contact with Knopsnyder were second-hand, and at no point did she complain directly to Russic. *Id.* When asked, Knopsnyder apparently informed Russic that she was not bothered by McNelly. *Id.* Plaintiff has characterized the conversation differently, claiming that Russic indicated that Knopsnyder was bothered by McNelly's conduct. Doc. No. 49 at 7. There are also differing accounts as to whether Plaintiff encouraged Russic to report the incident. According to Russic, Plaintiff never indicated that she should do so. Doc. No. 46-4 at 132. However, Plaintiff contends that she told Russic to report McNelly's conduct to Park. Doc. No. 49 at 8-9. Plaintiff allegedly told Hillegas about McNelly's conduct after her conversation with Russic, and Hillegas then told McNelly what had been said. Doc. No. 46-4 at 132. McNelly then allegedly confronted Russic and denied the accusations, with the exception of providing donuts. *Id.* Plaintiff further contends that she reported these new allegations to Joyce Farrell. Doc. No. 49 at 8.

On January 29, 2007, Plaintiff's employment at Somerset Hospital ended. Following a meeting with Joyce Farrell, Plaintiff presented a brief signed letter of resignation, which was acknowledged by Farrell and Glover. The letter stated "I have accepted Joyce Farrell's offer of six months of severance pay and continued insurance coverage in return for my resignation." Doc. No. 46-1 at 78. Shortly thereafter, Joyce Farrell sent an email to Glover, Park, and Mike Farrell regarding Plaintiff's alleged resignation. Doc. No. 46-1 at 88; Doc. No. 46-2 at 86. Joyce Farrell characterized the meeting as a mutual understanding between her and Plaintiff that their working relationship was strained and ineffectual, that Plaintiff had been frustrated with the computer conversion and day-to-day workings of the hospital, and that the stress of Plaintiff's job was taking a toll on her health. Doc. No. 46-1 at 88. Farrell explained that Plaintiff had been experiencing difficulty with the conversion process, and that co-workers and McKesson representatives had found it difficult to work with Plaintiff. Doc. No. 46-2 at 86. Attempting to confront Plaintiff about her problems was unproductive and unpleasant. *Id.* Farrell acknowledged that Plaintiff protested resignation and brought up events from the past and asserted that many of the conversion problems were attributable directly to McKesson; however, discussion was cut off because Farrell did not want to "go there again." Doc. No. 46-1 at 88. Farrell also felt that once Plaintiff began to contemplate her purported resignation, she would likely re-contact the hospital. *Id.*

On February 9, 2007, Plaintiff wrote to Mike Farrell to gain insight as to the rationale behind what she alleged was her termination from the hospital in January. Doc. No. 46-1 at 72-77. She made numerous allegations regarding her interactions with fellow hospital staff members and the circumstances leading to her alleged termination. *Id.* at 74-6. She concluded

the letter by thanking Mike Farrell for the severance pay, but noted that she was taken aback by her termination following over fifteen years of service. *Id.* at 77.

Plaintiff brought a charge against Somerset Hospital with the Equal Employment Opportunity Commission ("EEOC") on August 31, 2007. Doc. No. 16. She claimed that her employment at the hospital was terminated due to reporting that McNelly was sexually harassing other employees of the hospital. At that time, she also indicated that she wished for the charge to be cross-filed with the Pennsylvania Human Relations Commission ("PHRC"). *Id.*

On February 12, 2008, as a part of its investigation into Plaintiff's claims against Somerset Hospital, the EEOC conducted an interview with Joyce Farrell. Doc. No. 46-2 at 72-74. Farrell explained the computer conversion that the hospital underwent during Plaintiff's employment, and further reported many problems with respect to billing implementation. *Id.* at 72. Farrell averred that these billing issues were Plaintiff's personal responsibility. *Id.* Miller had been assigned to assist Plaintiff by testing the billing system. *Id.* However, Plaintiff and Miller allegedly had a poor working relationship, adding tension to the already stressful conversion process. *Id.* Farrell accused Plaintiff of failing to develop policies and procedures for the new billing system, thus making her co-workers' jobs more difficult. *Id.* Farrell claimed that Miller quit because of Plaintiff's behavior in the workplace. *Id.* Plaintiff then refused to train another superuser, because she felt she could handle the additional work, and that training a new superuser would take too much time. *Id.* Plaintiff then purportedly proceeded to complain to Joyce Farrell about her additional workload. *Id.* Joyce Farrell described a worsening relationship between herself and Plaintiff, in large part because Plaintiff became defensive when problems with the conversion arose. *Id.* When Plaintiff left for additional training in Charlotte, hospital staff allegedly met and concluded that Plaintiff was hindering a smoother conversion.

*Id.* at 73. Others alleged that Plaintiff was abrasive and unhelpful. *Id.* at 72-3. According to Farrell, Plaintiff's attitude had allegedly been deteriorating over the previous five years following her husband's termination from employment at the hospital. *Id.* at 73. Plaintiff allegedly began reporting to Farrell that her physical and psychological health were both suffering, and that she was not happy at the hospital. *Id.* Farrell averred that she and Park determined that they would terminate Plaintiff, but offer her a severance package. *Id.* While Plaintiff was reluctant to submit her resignation in exchange for severance, if she did not do so, the hospital would still have dismissed her. *Id.* With respect to Plaintiff's reports regarding McNelly's behavior, Joyce Farrell stated that she joined Plaintiff in reporting the first incident, but that the second incident was not reported because Farrell considered it to be second-hand information that the victim needed to report on her own. *Id.* at 73-4. Farrell contended that she never informed Park about the second report by Plaintiff. *Id.* at 74.

The EEOC also sought testimony from Glover on February 12, 2008. Doc. No. 46-4 at 138. Glover explained that she was aware of Plaintiff's October 2005 complaint regarding McNelly, but that she had not been aware of Plaintiff's second report of his conduct to Joyce Farrell until after Plaintiff filed her claim against the hospital. *Id.* Glover stated that following her investigation of the first incident, stern warnings were issued, and neither McNelly nor Hillegas were to contact one another. *Id.* Glover stated that she did eventually interview Russic about McNelly's conduct towards Knopsnyder, but that after consulting with Park, they felt that no action needed to be taken. *Id.* Glover asserted that Plaintiff's termination was in no way related to her reports of McNelly's behavior, but was instead a result of her job performance. *Id.* Plaintiff's severance package was considered normal for an employee with a work history as long as hers. *Id.* It was also noted that an exit interview for Plaintiff was not necessary. *Id.*

The EEOC also contacted Park on February 12, 2008. Doc. No. 46-5 at 121-22. Park indicated that McKesson representatives frequently complained that Plaintiff was difficult to work with. *Id.* at 121. Park believed that the conversion process had overwhelmed Plaintiff and that she was not capable of acknowledging her difficulties. *Id.* After discussions with Joyce Farrell about Plaintiff's performance, Park believed that Plaintiff should have been terminated. *Id.* However, he left the ultimate decision to Farrell. *Id.* Eventually, Plaintiff's alleged inability to work productively with co-workers and to handle the work assigned to her was unacceptable. *Id.* When Plaintiff was away in Charlotte for training, Joyce Farrell gathered the opinions of Plaintiff's co-workers, and the results were very negative. *Id.* At that point both Farrell and Park felt that Plaintiff should be terminated. *Id.* Park indicated that severance packages are typical for all long-term employees, and that Plaintiff's reports of alleged harassment by McNelly were unrelated to her dismissal. *Id.* at 121-2. Park noted that action had been taken immediately following Plaintiff's first report of October 2005. *Id.* at 122. Park stated that he was not aware of Plaintiff's second report to Joyce Farrell until Plaintiff filed her claim against the hospital. *Id.* Park and Farrell discussed Plaintiff's second report and agreed that the information was not sufficiently serious to investigate. *Id.* However, in late 2007, when information regarding continued workplace indiscretions by McNelly was brought to light, the hospital terminated McNelly's employment. *Id.*

In an undated written statement provided some time after Plaintiff's separation from the hospital, Hillegas indicated that Plaintiff was a source of difficulty at Somerset Hospital, particularly with respect to the hospital's computer conversion. Doc. No. 46-1 at 41, 90. She claimed that Plaintiff asked staff members, including Hillegas, to engage in inappropriate personal and sexual conversations in the workplace. *Id.* at 90. She further alleged that if a staff

11

member did not participate in such conversations, Plaintiff would retaliate and "act spiteful for days." *Id.* Hillegas also indicated that Plaintiff would not respond to requests for assistance in a timely manner, and became angry if asked to deal with issues she could not resolve. *Id.* Plaintiff allegedly failed to properly train her subordinates with respect to the computer conversion. *Id.* Hillegas also asserted that Plaintiff "tried to cause unneeded problems for [McNelly]." *Id.*

## III. JURISDICTION AND VENUE

This court has subject-matter jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and over Plaintiff's state claim pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction). Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practice at issue is alleged to have been committed in this District.

## IV. STANDARD OF REVIEW

"Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56 (a).[4] Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those which will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248.

---

[4] Rule 56 was revised in 2010. The standard previously set forth in subsection (c) is now codified as subsection (a). The language of this subsection is unchanged, except for "one word—genuine 'issue' bec[ame] genuine 'dispute.'" Fed. R. Civ. P. 56 advisory committee's note, 2010 amend.

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleading," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (internal citations omitted); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); see also *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue" (internal quotation marks omitted)).

## V. DISCUSSION

Defendant asserts that Plaintiff has failed to adduce sufficient evidence to establish even a *prima facie* case of retaliation. Doc. No. 47 at 3. Alternatively, even if Plaintiff has established a *prima facie* case, Defendant asserts that it had a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Doc. No. 47 at 16. Plaintiff contends that she has met her burden at the summary judgment stage, and that when viewed in the light most favorable to the non-moving party, the facts not only meet the requirements for a *prima facie* showing of retaliation, but also show that Defendant's proffered justification for terminating her employment was merely a pretext for retaliation. Doc. No. 49 at 2, 11.

Plaintiff asserts her federal retaliation claim under 42 U.S.C. § 2000e-3(a), which states in relevant part that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate

against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

To make a *prima facie* case for retaliation under § 2000e-3(a), Plaintiff must show that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F. 3d 383, 386 (3d Cir. 1995)).

Following this initial showing, Defendant carries the burden to establish a legitimate, non-retaliatory reason for its conduct. *Moore*, 361 F.3d at 342. If Defendant makes such a showing, the burden then shifts back to Plaintiff, and requires evidence sufficient to convince a factfinder that Defendant's explanation was not only false, but also that retaliation was the true purpose behind Defendant's acts. *Id.* To survive a motion for summary judgment, Plaintiff must offer sufficient support to allow a factfinder to reasonably come to the above conclusions. *Id.*

### A. Plaintiff's Prima Facie Case

With respect to the first prong under the *prima facie* case requirements, evidence of unlawful conduct may be direct or indirect, and as soon as a potential witness could reasonably believe that such conduct has occurred, Plaintiff is under the protection of § 2000e-3(a). *Moore*, 461 F.3d at 345. Workplace conduct should be judged "by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Clark County School District v. Breeden*, 532 U.S. 268, 270-1 (2001) (quoting *Faragher v. Boca Raton,* 524 U.S. 775, 786 (1998)).

14

Defendant first argues that no reasonable individual could have perceived the statements by Russic to Plaintiff regarding McNelly's behavior towards Knopsnyder as unlawful behavior under Title VII. Doc. No. 47 at 3-4. Further, Defendant believes that Plaintiff's repetition of Russic's statement to Joyce Farrell could not be considered an actual "report" of unlawful behavior in accordance with the requirements of Title VII. *Id.* Defendant's argument fails for several reasons. First, regarding what a person with Plaintiff's knowledge could reasonably have concluded about McNelly's conduct towards Knopsnyder, there is considerable debate regarding what Russic actually told Plaintiff about McNelly's interactions with Knopsnyder, and what Plaintiff stated to Russic in response. Plaintiff alleged in deposition testimony that in late December of 2006, Russic informed her that McNelly was directing inappropriate, sexually suggestive behavior toward her subordinate Knopsnyder. Doc. No. 46-1 at 38. Plaintiff allegedly suggested that Russic report the conduct, but she refused because she allegedly believed McNelly was close friends with Park. Doc. No. 46-1 at 38. Plaintiff then told Joyce Farrell what she had heard. Doc No. 46-1 at 39.

However, in separate deposition testimony, Joyce Farrell claimed that Plaintiff's second report of allegedly inappropriate conduct by McNelly in the workplace occurred during a meeting between her and Plaintiff about billing issues. Doc. No. 46-2 at 18. Plaintiff conveyed that she had heard the information in a conversation with Russic. Doc. No. 46-2 at 18-19. Farrell claimed that she told Plaintiff that Knopsnyder was not her employee, and that as a department head, it was Russic's duty to report that information. Doc. No. 46-2 at 19. Farrell was not concerned because she considered the report by Plaintiff to be nothing more than second-hand information. Doc. No. 46-2 at 19. Farrell ordered Plaintiff not to get involved with the issue, because she had a significant amount of work to do. Doc. No. 46-2 at 19-20.

Russic testified that she talked to Plaintiff about McNelly's conduct toward her subordinate pharmacy technician, Knopsnyder, in the context of a larger conversation about McNelly and computer-related billing issues. Doc. No. 46-7 at 6, 8. Plaintiff allegedly prompted Russic's comments by asking if McNelly interacted with any women in Russic's department. Doc. No. 46-7 at 10, 13. She told Plaintiff that McNelly walked with Knopsnyder from her car, left her candy, and brought her donuts. Doc. No. 46-7 at 8. Allegedly, Plaintiff did not say anything in response to Russic's report about McNelly. Doc. No. 46-7 at 16. Russic testified that she did not believe McNelly's behavior was sexual or reportable at the time. Doc. No. 46-7 at 15, 20-21.

There is clearly a conflict among the testimony of the different parties, and there is no documentation that can be used for corroboration. In order to find in favor of Defendant on its summary judgment motion, the court would be required to make a credibility determination. Additionally, with respect to what a reasonable person in Plaintiff's position could have believed, in good faith, as to the appropriateness and lawfulness of McNelly's conduct towards Knopsnyder, it is important to note that Plaintiff had knowledge of prior allegations against McNelly. Moreover, while neither Knopsnyder nor Russic believed McNelly's actions were reportable at the time Plaintiff was made aware of his conduct, both women also testified that had they known what Plaintiff then knew regarding past allegations against McNelly, they would have felt differently. Doc. No. 46-7 at 9, 16; Doc. No. 46-6 at 8-10. Knopsnyder went as far as to say that she would have reported his conduct of her own accord. Doc. No. 46-6 at 10-11. On this point, the evidence tends to favor Plaintiff, and at the summary judgment stage, the court is compelled to view the facts in the light most favorable to Plaintiff.

Second, there is no required format for a "report" of unlawful conduct under Title VII. Opposition to unlawful conduct under Title VII can include informal complaints to management. *Moore*, 461 F.3d at 343; see also *Crawford v. Metro. Gov't of Nashville and Davidson County, Tennessee*, 555 U.S. 271, 129 S. Ct. 846, 851 (2009) ("'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's *opposition* to the activity.'") (citations omitted). Joyce Farrell acknowledged that Plaintiff made a statement about McNelly and his interactions with Knopsnyder. There is controversy in the relevant deposition testimony over the circumstances surrounding this report and the content of this report. As above, this involves issues of credibility not amenable to disposition at summary judgment. Further, the court is required to view the evidence in the light most favorable to Plaintiff as the non-moving party. Plaintiff's averment was that she made a serious report to Farrell – her manager – about perceived sexual harassment. The first requirement for a *prima facie* showing is therefore met.

Defendant next argues in its Motion that Plaintiff voluntarily resigned, and therefore did not suffer an adverse employment action as required under Title VII. However, Defendant's contention is easily disposed of based upon documentary evidence and testimony which suggests otherwise. Doc. No. 47 at 4-5. By her own testimony, Joyce Farrell indicated that when Plaintiff returned from her training trip in Charlotte, Farrell called her into a meeting to terminate her employment. Doc. No. 46-2 at 33. Farrell stated that she cleared the termination with Park before following through. Doc. No. 46-2 at 33. Farrell further stated that Plaintiff should prepare a letter of resignation, and that she would be given severance pay in exchange. Doc. No. 46-2 at 34. In her responses to the EEOC, Farrell averred that she and Park determined that they would terminate Plaintiff, but also offer her a severance package. Doc. No. 46-2 at 72-74.

17

Plaintiff was reluctant to submit her resignation in exchange for severance; however, if she did not do so, the hospital would still have dismissed her. Doc. No. 46-2 at 72-74. In his responses to the EEOC, Park also indicated that both he and Farrell believed that Plaintiff should be terminated. Doc. No. 46-5 at 121-22.

Plaintiff stated that upon returning to work on the morning of January 29, 2007, Farrell called Plaintiff into her office and informed her that she was "letting [Plaintiff] go." Doc. No. 46-1 at 22. Farrell allegedly demanded Plaintiff's resignation in return for severance pay. Doc. No. 46-1 at 22-23. Plaintiff accepted because she needed the income. Doc. No. 46-1 at 23. Her letter of resignation clearly indicated: "I have accepted Joyce Farrell's offer of six months of severance pay and continued insurance coverage in return for my resignation." Doc. No. 46-1 at 78.

The evidence leaves little doubt that Plaintiff was terminated. Plaintiff's own supervisor stated that if Plaintiff had not tendered her resignation in exchange for severance pay, she would have been terminated as an employee. Both Park and Joyce Farrell separately indicated that they had agreed that Plaintiff should be terminated. Even if Plaintiff's resignation could be argued to be "voluntary," as Defendant claims, it can hardly be argued that this was much better than simply being terminated. She was, in essence, forced to resign, or suffer the loss of severance pay – an action which might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). No more is required for the second prong of a *prima facie* showing. Viewed in the light most favorable to Plaintiff as the non-moving party, Plaintiff's termination clearly establishes the second prong of a *prima facie* showing of retaliation.

With respect to the third requirement for making out a *prima facie* case, Defendant argues that Plaintiff cannot put forward evidence showing temporal proximity, a pattern of

antagonism, or any other evidence sufficient to allow a reasonable factfinder to infer a causal connection between the loss of Plaintiff's job and her reports of allegations against McNelly. Doc. No. 47 at 6-16. Viewing the evidence in the light most favorable to the non-moving party, however, the court must find otherwise. There exist too many issues of credibility for the court to determine Defendant is entitled to summary judgment.

Evidence of causation need not be limited to timing and demonstrative proof, such as antagonistic conduct, but may include other evidence "gleaned from the record as a whole from which causation can be inferred." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000). Plaintiff may utilize a "broad array" of evidence. *Id.* at 283; see also *Abramson v. William Paterson College of New Jersey*, 260 F. 3d 265, 288-89 (3d Cir. 2001) (vague, inconsistent reasons for termination may also be relevant evidence). Causation – not temporal proximity or evidence of antagonism – is the relevant element of Plaintiff's prima facie case. Temporal proximity or antagonism merely provides an evidentiary basis from which an inference can be drawn. *Farrell* at 281 (citing *Kachmar v. Sungard Data Systems, Inc.*, 109 F. 3d 173, 177 (3d Cir. 1997)). Once again, because Plaintiff is the non-moving party, all inferences are drawn in the light most favorable to her.

Plaintiff rebuts Defendant's claim by showing that, in terms of temporal relationship, Plaintiff's second report of McNelly's conduct and her eventual termination were separated by only one month. Doc. No. 46-1 at 38; 46-7 at 7. Additionally, Plaintiff testified regarding continued antagonism beginning shortly after her first report of McNelly's conduct, when she began to experience exclusion from regular computer conversion meetings, and that this made performance of her job more difficult. Doc. No. 46-1 at 36-37. In terms of the broader picture of the circumstances which existed prior to her termination, Plaintiff claimed that Joyce Farrell

had initially questioned whether Plaintiff should report McNelly for his conduct towards Hillegas because McNelly and Park were friends, that after the first report, Farrell told Plaintiff that she should watch her back and avoid bringing any further allegations about McNelly to light, that Farrell became upset when Plaintiff did eventually report allegations about McNelly a second time, and that Farrell then terminated Plaintiff shortly thereafter with little to no explanation. Doc. No. 46-1 at 33, 36. Plaintiff further averred that Russic did not report McNelly's behavior with Knopsnyder because McNelly and Park were friends. Doc. No. 46-1 at 38.

Plaintiff also cites that there were no negative performance appraisals preceding her termination, that there was no documentation of McKesson's displeasure with Plaintiff, that she received regular pay raises and was promoted, and that there were no documented warnings or disciplinary actions anywhere in her file for poor performance or inappropriate behavior. In fact, there were two pieces of evidence which indicated that Plaintiff was not performing poorly: 1) a document written by a McKesson representative indicated that Plaintiff was doing well in training and 2) a Certificate of Excellence awarded to Plaintiff by McKesson for her performance during training in Charlotte. Doc. No. 55. Other evidence shows that Joyce Farrell had made an earlier statement to the effect that Plaintiff should be retained in her position because of her skills, despite potential layoffs to save money. Doc. No. 46-2 at 76-77.

Defendant attempts to bolster its position by citing deposition testimony and documentation produced largely after Plaintiff was terminated to show that her performance on the job and her interactions with co-workers – and not reports of McNelly's conduct – were the reasons for her termination. Once again, the documentation and differing testimony provided by each party presents the court with issues of fact and credibility determinations, which are not amenable to disposition at the summary judgment stage. When viewing this evidence in the light

most favorable to Plaintiff, however, there is evidence of temporal proximity, antagonism, and other circumstances suggesting a causal connection between Plaintiff's reports of McNelly's conduct and her termination.

**B. The Existence of a Non-Retaliatory Reason for Plaintiff's Termination**

Regarding whether Defendant had a legitimate, non-retaliatory reason for Plaintiff's termination, the issues of fact and questions of credibility are the same. Both parties present the same evidence to argue for and against the existence of such a reason. As such, viewed in the light most favorable to Plaintiff, the evidence does not support Defendant's contention that it is entitled to summary judgment.

## VI. CONCLUSION

Based upon the foregoing, Plaintiff has provided sufficient evidence, when viewed in the light most favorable to her as the non-moving party, to allow the Court to determine that she established a *prima facie* case for retaliation under Title VII. Further, when viewed in the light most favorable to Plaintiff, the facts provide a reasonable basis for her to argue that Defendant's proffered legitimate, non-discriminatory basis for her termination was pretext for intentional retaliation against reported allegations of sexual harassment. Accordingly, in light of the existence of numerous questions of fact and credibility, Defendant's Motion for Summary Judgment is denied. An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VOHNIE K. LEMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL CASE NO. 3:08-cv-127 |
| SOMERSET COMMUNITY | ) | |
| HOSPITAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this 21st day of October 2011, upon consideration of Defendant Somerset Community Hospital, Inc.'s Motion for Summary Judgment (Doc. No. 46), Defendant's Brief in Support of Motion for Summary Judgment (Doc. No. 47), Plaintiff's Brief in Opposition to Motion for Summary Judgment (Doc. No. 49), and Plaintiff's Response to Motion for Summary Judgment / Responsive Concise Statement (Doc. No. 50), in accordance with the above Memorandum **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**